1    **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7            **FOR THE DISTRICT OF ARIZONA**

8

9    United States of America,                    No. CR-22-08113-001-PCT-DJH

10                    Plaintiff,                   **ORDER**

11   v.

12   Kendall Kevin Anagal,

13                    Defendant.

14

15          Following a jury trial, Mr. Kendall Kevin Anagal ("Defendant") was found guilty

16   of three counts of Aggravated Sexual Abuse of a Child and one count of Abusive Sexual

17   Contact of a Minor.  (Doc. 122).  After trial, Defendant filed Motions seeking an Order

18   Producing the Jurors' Information (Doc. 126) and a Motion for Acquittal under Federal

19   Rule of Criminal Procedure 29 or, Alternatively, a Mistrial.  (Doc. 125).  The Government

20   has responded to each.  (Docs. 130; 132).  Defendant has not filed a Reply to either of the

21   Government's Responses and the time to do so has passed.  *See* LRCrim 47.1 (stating that

22   the moving party "shall have seven (7) days after service of the responsive memorandum

23   to file a reply memorandum if that party so desires").  Though the Defendant stated an

24   intent to supplement his Motion[1], he has so far failed to do so and the Court will not permit

25   further delay.

26          For the following reasons, the Court denies Defendant's Motions.

27   _____

28   [1] "Counsel herein has ordered the closing argument and rebuttal by the prosecution. Counsel herein requests the opportunity to supplement this pleading upon receipt of the transcript." (Doc 125 at ¶ 37).  To date, the docket only reflects the Government's request of the rebuttal closing transcript.  (Doc. 128).

1    **I.    Background**

2        Defendant was indicted by a grand jury in 2022 on four counts of Aggravated Sexual

3    Abuse of a Child and one count of Abusive Sexual Contact of a Minor.  (Doc. 1 at 1–3).

4    Defendant was convicted of three counts of Aggravated Sexual Abuse of a Child and one

5    count of Abusive Sexual Contact of a Minor.  (Doc. 122).  The jury returned no verdict on

6    count two: Aggravated Sexual Abuse of a Child.  (*Id*.)  Defendant now moves for an

7    acquittal or mistrial on his counts of conviction, and for juror's information to investigate

8    whether Juror 14 committed misconduct during deliberations.  (Doc. 126 at 1–2).

9        The Court conducted *voir dire* on the first day of trial, February 6, 2024, and

10   empaneled a fourteen-person jury.  (Doc. 108 at 1).  The Court admonished the jury that

11   they "must not communicate with anyone in any way about the case" numerous times

12   during trial.  (*See e.g*., Doc. 129 at 115).  After the parties rested their respective cases, but

13   before closing arguments, the Court instructed the jury on the law.  (Doc. 133 at 15–29).

14   Two of the fourteen jurors were randomly selected to serve as alternates: Juror 13 and Juror

15   10.  (*Id*. at 63).  The remaining twelve jurors began deliberations on the third day of trial,

16   February 8th.  (Doc. 113 at 1).  Shortly after deliberations started, the jury sent the Court

17   two notes in rapid succession.  (Doc. 133 at 65).  The first note read "We are hung 11-1"

18   and was signed by Juror 14.  (Doc. 121 at 2; Doc. 133 at 65).  The second note read

19   "Yesterday while leaving for lunch I witnessed 5 speaking to the two women who have

20   been sitting behind the defendant.  I heard, 'can anyone get on.'  It sounded as though he

21   was asking about life on the reservation.  I was exiting the elevator and witnessed it as I

22   passed to leave.  I apologize for delaying in saying something."  (Doc. 121 at 3; Doc. 133

23   at 66).  The second note was not signed by any juror but was delivered by Juror 14.  (Doc.

24   133 at 65).  The Court brought jurors 5 and 14 into open court for individual questioning.

25   (*Id*. at 67).

26        The Court first questioned Juror 14, who stated she wrote the second note.

27   (*Id*. at 68).  Juror 14 said that she observed Juror 5 speaking with two women who had been

28   in the courtroom watching the trial.  (*Id*. at 69).  Juror 14 stated that she heard Juror 5 ask

1    the women, "Can anyone get on?" and that she "just inferred" that Juror 5 was talking about

2    the Navajo Nation.  (*Id.*)  Juror 14 did not hear the women say anything in response. (*Id.*)

3          The Court next questioned Juror 5.  The Court informed Juror 5 that he had been

4    observed talking to individuals who had been seated in the courtroom.  When asked if he

5    recalled this, Juror 5 stated "I did have a conversation with someone in the elevator, yes."

6    (Doc. 133 at 71).  He then identified one of the individuals with whom he spoke as a woman

7    presently seated in the courtroom.  (*Id.* at 72).  Juror 5 stated that he asked the woman if

8    she was from the Navajo tribe and if anyone could get on as he wanted to pay his respects

9    to a friend who had passed away who was buried on the Navajo Nation.  (*Id.* at 72–73).

10   The woman told him that he could look up his friend's burial site in the census.  (*Id.* at 73).

11   Juror 5 told a different elderly woman, who was not presently in the courtroom, that his

12   friends last name was "Van Winkle" and she said that was a popular name.  (*Id.* at 74).

13   This was the extent of Juror 5's communication.  (*Id.*)

14         After Juror 5 returned to the jury room, the Government stated their belief that Juror

15   5 spoke with Defendant's sister and mother.  (*Id.* at 75–76).  Because of this, the

16   Government asked that Juror 5 be excused and replaced with an alternate juror.  (*Id.* at 76).

17   Defense Counsel argued Juror 5 should not be excused because the communication did not

18   relate to the case and Juror 5 is Navajo.  (*Id.* at 77).  The Court inquired how Defendant

19   knew Juror 5 was Navajo, and Defense Counsel conceded that she was "just assuming."

20   (*Id.*)  After Jurors 5 and 14 were questioned and the parties had an opportunity to be heard,

21   the Court  excused Juror 5 and stated it was very problematic that Juror 5 did not "adhere

22   to the Court's admonition at the beginning of the case, at the end of the day, at the various

23   breaks in terms of wearing the jury identification number, and refrain from communicating

24   or discussing matters" including inquiring about the area in which the facts were alleged

25   to have occurred.  (*Id.*)  Juror 10 was selected as an alternate and deliberations began anew

26   the next day, the fourth day of trial: February 9th.  (*Id.* at 78, 81–82).  That same day, the

27   jury reached a unanimous guilty verdict as to Counts 1, 3, 4, and 5; but could not reach a

28   verdict as to Count 2.  (Doc. 122 at 1–3).

1    While deliberations were occurring that morning, Defendant moved to disqualify

2  Juror 14 because she failed to immediately report an improper juror communication by

3  Juror 5 and for disclosing the jurors' vote count.  (Doc. 110 at 2–3).  Defendant also stated

4  that if "juror #5 was the lone holdout, Juror #14 may be engaged in the nefarious activity

5  of manipulating the jury process."  (*Id.* at 3).  The Court found that, even though Juror 14

6  was late to report her observation, Juror 14 complied with the Court's admonishment and

7  denied Defendant's Motion to Disqualify Juror 14.  (Doc. 134 at 4).  Now, Defendant has

8  filed a Motion seeking an Order Producing the Jurors' Information (Doc. 126) as well as a

9  Motion for Acquittal or Mistrial, based in part, on the same grounds.  (Doc. 125). The Court

10  will first address Defendant's Motion for Juror Information and then his Motion for

11  Acquittal.

12  **II.   Discussion²**

13  **A.   The Juror's Information**

14    In his Motion for Juror Information, Defendant argues that he is entitled to a fair

15  trial, presumably under the Sixth Amendment, and that he should be allowed to "investigate

16  and evaluate" the juror information to support a Motion for New Trial.  (Doc. 126 at 1).

17  Defendant also concedes that Federal Rule of Evidence 606(b) provides that certain juror

18  testimony regarding what occurred in a jury room is inadmissible "[d]uring an inquiry into

19  the validity of a verdict." *Warger v. Shaurers*, 135 S. Ct. 521 (2014).  (*Id.* at 2).  Defendant

20  states that he is seeking this information as there is possible misconduct by Juror 14 and

21  the juror information is "necessary for counsel to evaluate the request for an evidentiary

22  hearing and a Motion for a New Trial."  (*Id.*)  The Government argues that the Motion

23  should be denied as the juror information is protected by Rule 606(b), Supreme Court and

24  Ninth Circuit precedent interpreting this rule as well as the local rules.  (Doc. 130 at 4–6).

25    Indeed, Rule 606 prohibits a juror's "testimony" about "any statement made or

26  incident that occurred during the jury's deliberations; the effect of anything on that juror's

27

28  ² Defendant does not support his Motion with citations to case law or statutes.  Nor does he precisely state his arguments, so the Court is left to construe them based on the totality of his pleadings.  (*See* Doc. 125 at 1–5; Doc. 126 at 1–3).

- 4 -

1   or another jurors vote; or any juror's mental processes concerning the verdict or

2   indictment" during an inquiry into the validity of a verdict or indictment.  Fed. R. Evid.

3   606(b)(1).  Furthermore, the Court "may not receive a juror's affidavit or evidence of a

4   juror's statement on these matters." *Id*.  There are exceptions to this general prohibition,

5   however, including:

6           (A) extraneous prejudicial information improperly brought to the jury's attention;

7           (B) an outside influence improperly brought to bear on any juror; or

8           (C) a mistake was made in entering the verdict on the verdict form.

9   Fed. R. Evid. 606(b)(2).  The Supreme Court has addressed this Rule in a handful of

10  seminal cases, from which the Ninth Circuit derives several key principles, including:

11          (1) Rule 606 applies in any proceeding that involves an inquiry into the validity of

12          the verdict;

13          (2) Rule 606 bars juror testimony about the jury's internal processes, whether the

14          claimed irregularity took place inside or outside the jury room; and

15          (3) Rule 606 imposes a near categorical bar on juror testimony about statements or

16          events that occurred during the jury's deliberations.

17  *See United States v. Duffy*, 2024 WL 663440, at *1 (D. Ariz. Feb. 16, 2024).

18      Denying a motion to interrogate jurors "does not raise a constitutional problem

19  where there has been no specific claim of jury misconduct." *Mitchell v. United States*, 958

20  F.3d 775, 783 (9th Cir. 2020) (internal citations omitted).  But "where a juror makes a clear

21  statement that indicates he or she relied on racial stereotypes or animus to convict a

22  criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way

23  in order to permit the trial court to consider the evidence of the juror's statement and any

24  resulting denial of the jury trial guarantee."  *Pena-Rodriguez v. Colorado*, 580 U.S. 206,

25  209 (2017).

26      The Court construes Defendant's argument as challenging the validity of the verdict

27  given his allegation that there is "possible misconduct" by Juror 14 (Doc. 126 at 2); so,

28  Rule 606 applies and imposes a near categorical bar on juror testimony about statements

1  or events that occurred during the jury's deliberations. *Duffy*, 2024 WL 663440, at \*1.

2  Defendant does not assert any of the exceptions in Rule 606(b)(2) to support his Motion.

3  (Doc. 126 at 1–2).  Instead, he essentially asks to interrogate the jury about statements

4  made by jurors or incidents that occurred during the jury's deliberations, i.e., the Jury's

5  internal process—which is prohibited.  Fed. R. Evid. 606(b)(1); *Duffy*, 2024 WL 663440,

6  at \*1.  Thus, because Defendants argument does not fit one of the exceptions in Rule

7  606(b)(2), the Court denies Defendant's Motion.  *See Tanner v. United States*, 483 U.S.

8  107, 120 (1987) (stating that Rule 606 protects juror testimony and communication from

9  the parties unless "extrinsic influence or relationships have tainted the deliberations.").

10  ### B.    Acquittal or Mistrial

11  In his Motion for Acquittal or Mistrial, Defendant argues that the Court should

12  declare a mistrial, because of: (1) alleged juror misconduct, (2) alleged prosecutorial

13  misconduct during closing arguments, (3) the Court's refusal to admit extrinsic evidence

14  to cross-examine the victim's mother, and (4) alleged non-disclosure of a witness' cell

15  phone number.  (Doc. 125 at 2–5).  The Government argues that none of these arguments

16  serve as a basis to undo the jury's verdict.  (Doc. 132 at 6).  The Court will address each

17  argument in turn.

18  ### 1.    Alleged Juror Misconduct

19  Defendant essentially argues that the Court should have excused Juror 14 because

20  she failed to timely and immediately disclose a potential improper communication and

21  because she disclosed the jury's vote count in the first note the Court was sent.

22  (Doc. 125 at 3).  The Government argues that the actions of Juror 14 do not rise to a level

23  of misconduct that would warrant acquittal or a mistrial.  (Doc. 132 at 6).  The Court agrees.

24  A trial court has "broad discretion" to "respon[d] to allegations of juror bias or

25  misconduct," including "discretion to determine whether and when to hold an evidentiary

26  hearing on such allegations."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir.

27  1977).  When an error certain to result in reversal occurs, a trial court properly exercises

28  its discretion in declaring a mistrial.  *United States v. Bates*, 917 F.2d 388, 395 (9th

1    Cir.1990).  "The presence of a biased juror [generally] cannot be harmless; the error

2    requires a new trial without a showing of actual prejudice." *Dyer v. Calderon*, 151 F.3d

3    970, 973 n.2 (9th Cir. 1998).

4            Here, Defendant's arguments do not arise from speculation of juror bias or

5    prejudice.  Still, the Court held a hearing and determined that Juror 14 ultimately did not

6    need to be removed.  The Court concluded that, even though it was late, Juror 14 complied

7    with the Court's admonishment.  (Doc. 134 at 4).  Since Defendant's arguments are merely

8    speculative, the Court declines to reverse the jury's reasoned verdict and declare a mistrial

9    on this basis, especially in light of the lack of any evidence of bias or prejudice.  *See Dyer*,

10   151 F.3d at 973 n.2.

11                    **2.      Alleged Prosecutorial Misconduct**

12           Defendant next argues that the Government engaged in prosecutorial misconduct

13   during its' rebuttal by mentioning that Defendant could have subpoenaed Mr. Johnny

14   Garcia.  (Doc. 125 at 3–4).  The Government argues that this comment does not amount to

15   prosecutorial misconduct because a prosecutor is allowed to comment on a defendant's

16   power to subpoena witnesses if it is also made clear that the government carries the burden

17   of proof.  (Doc. 132 at 7 (citing *United States v. Flournoy*, 842 F.3d 524 (7th Cir. 2016)

18   ("[A]s long as it is clear to jurors that the government carries the burden of proof, the

19   prosecutor may tell the jury that a defendant has the power to subpoena witnesses.")).  The

20   Government avers that it pointed out Defendant's ability to subpoena witnesses in response

21   to Defendant's numerous references to Mr. Johnny Garcia, a witness who never testified.

22   (Doc. 132 at 7–8).

23           During closing arguments, Defense counsel stated, in pertinent part:

24           Ladies and gentlemen, today is judgement day. Mr. Anagal has had to live
             with these horrific, untruthful, dishonest, disingenuous, fabricated,
25           embarrassing and harmful allegation for months. Why? Why? So that Alvita
             Tsosie [(Victim's Mother)] can save her relationship with her boyfriend
26           Johnny Garcia and they can raise [Defendant's] daughter. This is a classic
             case of parental alienation, manipulation, deceit, deception, fraud, all
27           orchestrated by Alvita Tsosie to save her relationship with Johnny Garcia.
28

. . .

This case would be a lot easier if you guys had a medicine man 'cause he could come in and he could testify as to what happened. He could also testify as to Johnny being there, you know. There is no medicine man. And Johnny Garcia, he's not coming either. He don't want nothing to do with court proceedings. Couldn't he, Johnny, couldn't he -- Johnny could have likewise cleared up things. He could have cleared up a couple things.

. . .

This is an incredible story. Where is Johnny Garcia? He could have cleared this all up for us.

. . .

Ladies and gentlemen, the reason we are here in criminal court and not family court is because we can't risk Johnny Garcia knowing that [K.T.] is Kendall Anagal's biological child. Shame on -- shame, shame, shame on Alvita.

(Doc. 133 at 46, 49, 53–54, 56).

During rebuttal argument, the Government stated "Defense counsel has talked about -- argued that we, the government, should have called Johnny Garcia to clear this thing right up. And although the government always bears the burden of proof, the defendant also has the power to subpoena witnesses.  If they thought Johnny Garcia could clear this whole thing up, they could have subpoenaed him too."  (Doc. 133 at 58–59).

It is improper, under the Fifth Amendment's guarantee against compelled self-incrimination, for a prosecutor to "comment on a defendant's decision not to testify." *United States v. Preston*, 873 F.3d 829, 842 (9th Cir. 2017) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)).  A prosecutor's comment violates the Fifth Amendment where it is "manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Rhoades v. Henry*, 598 F.3d 495, 510 (9th Cir. 2010) (citation omitted). However, a prosecutor's "comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify."  *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) (citing *United*

1    *States v. Williams*, 990 F.2d 507, 510 (9th Cir. 1993)).

2           Here, the Government did not comment on Defendant's decision not to testify but

3    that he could have subpoenaed Johnny Garcia to testify.  (Doc. 133 at 58–59).  *Cabrera*

4    dictates that a prosecutor may comment on a criminal defendant's failure to call a witness

5    as long as they do not violate the defendant's Fifth Amendment rights by commenting on

6    his failure to testify.  201 F.3d at 1250.  The Government's comment was not of such nature

7    that the jury would "naturally and necessarily take it to be a comment on the failure to

8    testify." *Rhoades*, 598 F.3d at 510.  The Court concludes that no prosecutorial misconduct

9    occurred during closing arguments.

10                          **3.      Extrinsic Evidence**

11          Defendant next argues that the Court erred by refusing to admit extrinsic evidence

12   during the cross-examination of the victim's mother.  (Doc. 125 at 4–5).  The Government

13   argues the admission of this evidence was impermissible under Rule 608, as the Court

14   ruled.  (Doc. 132 at 8–9).  The Court determined that the evidence was inadmissible

15   because this evidence was extrinsic evidence of the witness' specific instance of conduct

16   designed to impeach her credibility.  *See* Fed. R. Evid. 608(b).

17          Federal Rules of Evidence 608 and 613 govern what evidence can be used to attack

18   a witness character or impeach their inconsistent statements.  Rule 608 states that a

19   witness's credibility "may be attacked or supported by testimony about the witness's

20   reputation for having a character for truthfulness or untruthfulness, or by testimony in the

21   form of an opinion about that character." *Id*. at 608(a).  However, "extrinsic evidence is

22   not admissible to prove specific instances of a witness's conduct in order to attack or

23   support the witness's character for truthfulness.  But the court may, on cross-examination,

24   allow them to be inquired into if they are probative of the character for truthfulness or

25   untruthfulness of" the witness.  *Id*. at 608(b).  Rule 613 allows extrinsic evidence of a

26   witness's prior inconsistent statement, but only if the witness is "given an opportunity to

27   explain or deny the statement and an adverse party is given an opportunity to examine the

28   witness about it, or if justice so requires."  Fed. R. Evid. 613(b).

1    "Rule 608(b) does not address whether extrinsic evidence is admissible under the
2    theory of impeachment by contradiction."   *United States v. Chu*, 5 F.3d 1244, 1249
3    (9th Cir. 1993).   Rule 613(b) contains no bar, beyond foundational requirements, to
4    extrinsic evidence of prior inconsistent statements. *See United States v. Monroe*, 943 F.2d
5    1007, 1012 (9th Cir. 1991).   The trial court "has broad discretion over whether to admit
6    extrinsic evidence to rebut a witness' direct testimony."   *United States v. Higa*, 55 F.3d
7    448, 452 (9th Cir. 1995).

8    At trial, Defendant attempted to introduce a Tribal Court child support modification
9    order where the victim's mother avowed her youngest child was the Defendant's biological
10   child.  (Doc. 131 at 46; 125-1 at 2).   The Court reviewed the exhibit and noted that it did
11   not impeach the witness's testimony thus far.  (Doc. 131 at 49).   The Court concluded that
12   the document was not admissible but stated that if the witness "makes an inconsistent
13   statement with regard to who the biological father is of that young child, the youngest child,
14   then [Defendant] may probe into the content of what this says, what she presented to an
15   adjudication officer. But beyond that [the Court will not] admit the document itself."  (*Id.*
16   at 50).   During the cross-examination of victim's mother, Defendant asked her who the
17   father of her youngest child was, and she replied "Johnny Garcia."  (*Id*. at 53).   Defendant
18   then asked the victim's mother if she represented to a court that her youngest child was
19   Defendant's child and she answered "yes."  (*Id.*)

20   Defendant now argues that the denial of "Exhibit 1" diminished his ability to cross-
21   examine victim's mother and challenge her credibility.  (Doc. 125 at 5).   Not so.   This
22   exhibit is a textbook example of extrinsic evidence offered to prove specific instances of a
23   witness's conduct to attack their character for truthfulness—which is not admissible at trial.
24   *See* Fed. R. Evid. 608(b).   Defendant was allowed to attack the witness' credibility within
25   the bounds of Rule 613, but she never testified inconsistently with the proposed exhibit.  In
26   fact, she admitted that she lied on the application.  (Doc. 131 at 53).   The admission of the
27   exhibit itself would have also been cumulative.   *See* Fed. R. Evid. 403 ("The court may
28   exclude relevant evidence if its probative value is substantially outweighed by a danger of

1  . . . needlessly presenting cumulative evidence.").  Thus, the Court properly excluded

2  Exhibit 1 under Rule 608(b).  *See United States v. Little*, 2012 WL 2563796, at *3 (N.D.

3  Cal. June 28, 2012) ("As a general rule, extrinsic evidence may not be used to impeach the

4  credibility of a witness.").

5  ### 4.    Alleged Non-Disclosure of Evidence

6  Defendant finally argues that the Government should have provided Defendant with

7  a phone number for the "medicine man" who the victim's mother and Johnny Garcia

8  visited.  (Doc. 125 at 4).  The Government argues that the "non-disclosure of an

9  unconfirmed telephone number for a potential witness whose name and location was

10  disclosed sufficiently in advance of trial does not justify overturning the jury's verdict or

11  declaring a mistrial."  (Doc. 132 at 9).

12  The Government states that on December 22, 2023, it provided two Federal Bureau

13  of Investigations ("FBI") reports that contained the medicine man's name and that the

14  victim's family had visited him in Shiprock, New Mexico.  (Doc. 132 at 9).  At trial, FBI

15  Special Agent Moneypenny testified that he called a number he received for the medicine

16  man and left two voicemails, but he never received a response.  (Doc. 131 at 148–49).  The

17  Government admits that this number was never provided to Defendant.  (Doc. 132 at 9).

18  Under *Brady v. Maryland*, 373 U.S. 83 (1963), prosecutors have a duty to disclose

19  exculpatory evidence in their possession that is favorable to the accused.  *United States v.*

20  *Bagley*, 473 U.S. 667, 682 (1985).  "*Brady* is not confined to evidence that affirmatively

21  proves a defendant innocent: Even if evidence is merely 'favorable to the accused,' its

22  suppression violates *Brady* if prejudice results."  *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir.

23  2004) (citations omitted).  "[T]he suppression by the prosecution of evidence favorable to

24  an accused upon request violates due process where the evidence is material either to guilt

25  or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373

26  U.S. at 87. The prosecution must also produce evidence that impeaches a witness'

27  credibility.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).

28  Here, "the non-disclosure of an unconfirmed telephone number for a potential

- 11 -

witness whose name and location w[ere] disclosed sufficiently in advance of trial" does not amount to a *Brady*/*Giglio* violation.   This evidence is not material to guilt or punishment.  *Brady*, 373 U.S. at 87.  Nor has Defendant shown that it was "favorable" to him.  *Bagley*, 473 U.S. at 682.  Moreover, this number was never confirmed to belong to the medicine man and Defendant does not explain how this non-disclosure has prejudiced him.  *Gantt*, 389 F.3d at 912.  Finally, Defendant had this witness' information and could have asked the Government for his contact information—but evidently, did not.  Though the Government should have provided the telephone number to Defendant, the Court cannot conclude that the non-disclosure amounts to a *Brady*/*Giglio* violation.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Production of Jurors' Information (Doc. 126) is **DENIED**.

**IT IS ALSO ORDERED** that Defendant's Motion for Judgment of Acquittal or Mistrial (Doc. 125) is **DENIED**.

Dated this 10th day of April, 2024.

Honorable Diane J. Humetewa
United States District Judge